UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

---

BRANDI THOMAS and CAROL A. NIELSON,
individually and as representatives of a Class of
Participants and Beneficiaries of Acosta, Inc. 401(k)
Retirement Plan,

        Plaintiffs,                Case No:

        v.

ACOSTA, INC., BOARD OF DIRECTORS OF
ACOSTA, INC., and INVESTMENT
COMMITTEE OF THE ACOSTA, INC. 401(K)
RETIREMENT PLAN,

        Defendants.

---

## CLASS ACTION COMPLAINT

---

Plaintiffs Brandi Thomas and Carol A. Nielson ("Plaintiffs"), individually and as representatives of a Class of Participants and Beneficiaries of Acosta, Inc. 401(k) Retirement Plan (the "Acosta Plan" or "Plan"), by their counsel, WALCHESKE & LUZI, LLC, and CHIRINOS LAW FIRM, PLLC, as and for claims against Defendants Acosta, Inc. ("Acosta"), Board of Directors of Acosta, Inc. ("Board"), and the Investment Committee of Acosta, Inc. ("Plan Committee") (collectively "Defendants"), allege and assert to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.     This is an ERISA fiduciary-breach case challenging Defendants' administration of Plan forfeitures in a manner that overwhelmingly benefited the employer by reducing employer contribution obligations, while allocating only a de minimis portion of forfeitures to defray Plan administrative expenses.

2.     The Plan contains express forfeiture provisions recognizing that forfeitures may be used to reduce employer contributions and to pay Plan expenses.

3.     Notwithstanding these provisions and ERISA's fiduciary standards requiring loyalty to participants and prudent process, Defendants maintained a longstanding practice in which forfeitures were used almost entirely to reduce employer contributions, leaving Plan expenses otherwise payable by participants and the Plan.

4.     As documented in the exhausted administrative record, Defendants allocated extremely small percentages of forfeitures for Plan expenses from 2020 to 2024, from a low of 0.81% in 2020 to a high of 6.07% in 2023:

**Percent of Forfeitures Available Used to Pay Plan Expenses**

| | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **Forfeitures Used to Pay Plan Expenses** | $17,245 | $22,870 | $53,809 | $107,332 | $71,485 |
| **Total Available for Direction** | $2,122,347 | $1,961,110 | $1,636,172 | $1,768,296 | $1,802,576 |
| **Percent of Forfeitures Available Used to Pay Plan Expenses** | 0.81% | 1.17% | 3.29% | 6.07% | 3.97% |

5. Instead of prudently evaluating how to best deploy plan assets that had been forfeited by departing Plan participants, Defendants reflexively used those forfeitures to primarily benefit Acosta, to the detriment of the Plan and its participants, by applying over $14 million of Plan forfeitures (when compounding for interest) to offset Acosta's contractual obligations to make declared employer contributions to the Plan between 2020-2025:

| Amount Not Used to Pay Eligible Plan Expenses | | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **Forfeitures Used to Reduce Employer Contributions** | $2,044,999 | $1,811,421 | $1,495,104 | $1,605,398 | $1,643,071 | *$1,643,071* |
| **Forfeitures Used to Pay Plan Expenses** | $17,245 | $22,870 | $53,809 | $107,332 | $71,485 | *$71,485* |
| **Forfeitures Allocated to Participants** | $0 | $0 | $0 | $0 | $0 | *$0* |
| **Total Forfeitures Disclosed Being Used** | **$2,062,244** | **$1,834,291** | **$1,548,913** | **$1,712,730** | **$1,714,556** | ***$1,714,556*** |
| **Total Direct Compensation** | $566,701 | $534,810 | $685,233 | $939,533 | $725,647 | *$725,647* |
| **Plan Expenses that should have been paid with Forfeitures** | $549,456 | $511,940 | $631,424 | $832,201 | $654,163 | *$654,163* |
| **Cumulative Losses** | $549,456 | $1,061,396 | $1,692,820 | $2,525,021 | $3,179,184 | *$3,833,346* |
| Compounding Percentage (VIIIX) | | *11.26%* | *-17.14%* | *16.07%* | *11.40%* | *11.10%* |
| **Potential Cumulative Compounded Losses** | **$549,456** | **$1,123,259** | **$1,562,183** | **$2,645,489** | **$3,601,166** | **$4,654,962** |

6. As illustrated in the chart above, Defendants' unconsidered decision to primarily use Plan forfeitures to benefit Acosta resulted in Plan participants paying nearly $4.7 million in Plan expenses from 2020 to 2025 to the Plan's third-party service provider, Fidelity Investments Institutional ("Fidelity"). Plan forfeitures should have been utilized to substantially defray those Plan expenses.

7. Plaintiffs timely pursued their Plan's internal claims and appeal procedures challenging Defendants' forfeiture practices.

8. Defendants issued a final written denial dated January 13, 2026, denying Plaintiffs' internal appeals and advising Plaintiffs of their right to file a civil action under ERISA § 502(a).

9. Plaintiffs now seek Plan-wide relief under ERISA §§ 502(a)(2) and 409(a) and appropriate equitable relief under ERISA § 502(a)(3), including restoration of losses to the Plan, surcharge, injunctive relief, and an accounting.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under ERISA, 29 U.S.C. § 1001 et seq.

11. Plaintiffs seek relief under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), on behalf of the Plan for relief under ERISA § 409(a), 29 U.S.C. § 1109(a). Plaintiffs also seek appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

12. Venue is proper in this District under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, the breaches and violations occurred in this District and/or Defendants reside or may be found in this District, and the Plan itself has chosen this District for all fiduciary breach claims involving the Acosta Plan.

## PARTIES

13.    Plaintiff Brandi Thomas is, and at all relevant times was, a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7), and paid Plan administrative expenses during that same period.

14.    Plaintiff Carol A. Nielson is, and at all relevant times was, a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7), and paid Plan administrative expenses during that same period.

15.    Plaintiffs bring this action in a representative capacity on behalf of the Plan and a proposed class of similarly situated participants and beneficiaries.

16.    Plaintiffs have Article III standing to bring this action on behalf of  the Acosta Plan because they suffered actual injuries-in-fact through the misallocation of Plan forfeitures by Defendants with regard to the Acosta Plan during the Class Period by not having Plan forfeitures utilized to defray more of their Plan administrative expenses. Those injuries are fairly traceable to Defendants' unlawful conduct in using Plan forfeitures almost exclusively for their own benefit to reduce their contributions to the Plan, and those harms are likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and to the Class.

17.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), on behalf of the Acosta Plan and for relief that sweeps beyond their own injuries.

18.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan forfeitures) necessary to understand that Defendants breached their fiduciary duties until shortly before they first filed their internal claims involving forfeiture allocation with Acosta in August 2025.

19.     Having never managed a very large 401(k) plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of how Plan forfeitures should be allocated.

20.     Defendant Acosta, Inc. ("Acosta" or the "Company") is the Plan sponsor and/or a fiduciary to the extent it exercised discretionary authority or control over the administration and management of the Plan. In the United States, Acosta maintains its principal place of business at 6651 Gate Parkway, Jacksonville, FL 32556. In this Complaint, "Acosta" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

21.     Defendant Acosta is also the Plan Administrator within the meaning of ERISA and is responsible for the administration of the Plan, including responding to claims and appeals.

22.    Defendant Investment Committee (the "Plan Committee") is a fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because it exercised discretionary authority and control with respect to Plan administration, Plan expenses, and forfeiture practices.

23.    Acosta acted through its officers, including Defendants Board of Directors ("Board") and Plan Committee, to perform Plan-related fiduciary functions in the course and scope of their business. Acosta and its Board appointed Plan fiduciaries to the Plan Committee, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Acosta and its Board are also fiduciaries of the Acosta Plan on this basis within the meaning of 29 U.S.C. § 1002(21)(A).

24.    With 13,566 participants and $838,887,547 in assets under management as of December 31, 2024, the Acosta Plan is one of the larger retirement plans in the country. It ranks in the top 0.11% of over 756,949 retirement plans in terms of the number of participants and the top 0.21% of plans in terms of the value of its assets.

25.    From 2020 to 2025, Acosta's annual revenue ranged from approximately $1.6 billion to $1.9 billion per year.

## ERISA'S STRUCTURE AND PURPOSE

26.     ERISA exists, in large part, to protect the interests of participants, and their beneficiaries, in employee retirement plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citing 29 U.S.C. § 1001(b)).

27.     Over the past several decades defined contribution plans, like the Acosta Plan, have become the primary savings vehicle for most Americans. By 2022, there were more than 121 million participants who were relying on benefits from defined contribution plans to provide some or all of their retirement benefits. See https://www.congress.gov/crs-product/R48470; *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008) ("Defined contribution plans dominate the retirement plan scene today.").

28.     Defined contribution plans allow employees to defer the payment of taxes on compensation contributed to the Plan. As a result, there are many IRS rules and regulations that define the requirements a plan must follow in order to receive the benefit of deferring taxes on contributions. To the extent that employers agree to make contributions to defined contribution plans, the employers also receive a tax benefit.

29.     A defined contribution plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any

forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

30.     As such, a participant's retirement account in a defined contribution plan equals (1) the amount of the participant's voluntary contributions; plus (2) the amount of any employer contributions; plus (3) any investment returns on those contributions; minus (4) plan and investment expenses paid to third-party service providers. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 697-98 (2025) (explaining that defined contribution participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses. Those expenses include fees paid to service providers.").

31.     In addition, employers, like Acosta, also derive many other indirect benefits by virtue of sponsoring defined contribution plans. For example, in addition to tax benefits, retirement plans are critical tools for employers to attract and retain high quality employees. That is why plan sponsors rarely terminate plans or eliminate contributions to their plans, because doing so would put them at a substantial competitive disadvantage and make it much more difficult to attract and retain talented employees.

32.     As relevant to this case, under the circumstances prevailing well prior to the Class Period, it was and is understood that it is in the best interest of plan participants to enable them to participate in the potential for market

earnings sooner rather than later. That general understanding applies to both contributions from employees as well as the allocation of forfeited plan assets and employer contributions.

33.    For example, ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that contributions of Plan participants are promptly invested pursuant to the direction of each Plan participant and are not allowed to sit indefinitely in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving plan participants from the potential for investment earnings. See, e.g., DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); see also 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from the employer's general assets); DOL Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer").

34.    Additionally, as relevant to this case, under the circumstances prevailing well prior to the Class Period, it was and is understood that plan expenses can have a dramatic detrimental impact on the retirement benefits provided by defined contribution plans.

35.    For example, according to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement.[2] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.

## ERISA FIDICIARY STANDARDS

36.    ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Acosta Plan, that are covered by ERISA.

37.    Defendants are required by ERISA to: "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and – (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B) (emphasis added).

38.    ERISA's fiduciary duties are the "highest known to the law," *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997).

39.    ERISA explicitly requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and (A) for the

---

[2] U.S. Dept. of Labor *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dol-gov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

exclusive purpose of: (i) providing benefits to participants and their benefi-ciaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) (emphasis added).

40.     The duty of prudence imposed by 29 U.S.C. § 1104(a)(1) focuses on the thoroughness of a fiduciary's investigation before making a decision and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular" decision. *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021).

41.     A fiduciary's decision-making process is always evaluated based on "the circumstances then prevailing", i.e., the facts the fiduciaries knew at the time or should have known had they employed a prudent process.  29 U.S.C. § 1104(a)(1)(B).

42.     "[A] claim for breach of the duty of prudence will survive a motion to dismiss if the court, based on circumstantial factual allegations, may rea-sonably infer from what is alleged that the process was flawed or that an ade-quate investigation would have revealed to a reasonable fiduciary that the in-vestment at issue was improvident." *Sacerdote v. NY Univ.*, 9 F.4th 85, 108 (2d Cir. 2021); *Stengl v. L3Harris Techs., Inc.*, No. 6:22-cv-572-PGB-LHP, 2023 U.S. Dist. LEXIS 50692, at *19 (M.D. Fla. Mar. 24, 2023) ("[B]ecause ERISA plaintiffs generally do not have inside information regarding the fiduciary's process, an ERISA plaintiff alleging breach of fiduciary duty does not need to

plead details to which she has no access, as long as the facts alleged tell a plausible story—just as with motions to dismiss in other areas of substantive law.").

43.    Additionally, ERISA makes explicit that the fiduciary duties set forth above cannot be overridden by plan terms, stating that fiduciaries must follow plan terms only "insofar" as they are  "consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104 (a)(1)(D).

44.    The Supreme Court warns ERISA fiduciaries that they are not immunized from their duties to plan participants when they purport to adhere to a plan document. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA).

45.    Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

46.    Accordingly, the Plan Committee is a fiduciary because it is the Plan's Administrator (named fiduciary), vested with authority to manage and

13

administer the Plan, and because it exercised discretionary authority with respect to allocating Plan forfeitures at issue here.

47.    Acosta and its Board are fiduciaries with respect to the appointment and monitoring of the Committee because they appointed the Plan Committee as Administrator and retained responsibility for monitoring the Committee.

48.    Despite the conflict of interest presented by the decision to use Acosta Plan's forfeitures for Acosta's own benefit, Defendants also breached their duty of prudence by failing to undertake any prudent investigation into how to most prudently utilize those Plan forfeitures, including whether they should have used more of those forfeitures to reduce or eliminate Plan administrative expenses for Plaintiffs and other Plan participants during the Class Period.

## STATEMENT OF FACTS

### A.    The Plan's Forfeiture Provisions

49.    The Plan includes provisions governing forfeitures and their allocation.

50.    Section 6.18 of the Plan, titled "Forfeitures to Reduce Employer Contributions," provides that employer contributions "shall be reduced" by forfeitures "that are not used to pay Plan expenses" and applied against employer contributions for the plan year.

14

51.    Section 13.4 of the Plan, titled "Treatment of Forfeited Amounts," provides that forfeitures "shall be used to reduce Employer Contributions and Plan expenses" for the year of forfeiture or the subsequent plan year.

52.    These provisions establish that Plan forfeitures may be used for more than one purpose, including defraying Plan expenses and reducing employer contributions.

53.    Upon their deposit into the Plan's trust funds, all participant contributions and company contributions become assets of the Plan.

54.    To determine whether forfeitures will be allocated toward Plan expenses or toward reducing Acosta's Plan contributions, the Plan Committee makes those discretionary, forfeiture allocation determinations in a fiduciary capacity.

55.    Unless the Plan Committee allocates Plan forfeitures to pay Plan expenses, the Plan's administrative expenses are charged to the Plan participants' accounts.

56.    Defendants received a benefit while participants simply received that which they would have received anyway, while remaining on the hook for paying their share of the Plan's administrative expenses.

57.    The Acosta Plan's 5500 Forms, from 2020 to 2025, show that Plan participants, like Plaintiffs, paid a total of almost five million in Plan expenses

(with forfeitures only being used to pay about $270,000, during the same period), while Acosta utilized over $14 million dollars in Plan forfeitures to reduce their own contributions.

| Amount Not Used to Pay Eligible Plan Expenses | | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **Forfeitures Used to Reduce Employer Contributions** | $2,044,999 | $1,811,421 | $1,495,104 | $1,605,398 | $1,643,071 | *$1,643,071* |
| **Forfeitures Used to Pay Plan Expenses** | $17,245 | $22,870 | $53,809 | $107,332 | $71,485 | *$71,485* |
| **Forfeitures Allocated to Participants** | $0 | $0 | $0 | $0 | $0 | *$0* |
| **Total Forfeitures Disclosed Being Used** | **$2,062,244** | **$1,834,291** | **$1,548,913** | **$1,712,730** | **$1,714,556** | *$1,714,556* |
| **Total Direct Compensation** | $566,701 | $534,810 | $685,233 | $939,533 | $725,647 | *$725,647* |
| **Plan Expenses that should have been paid with Forfeitures** | $549,456 | $511,940 | $631,424 | $832,201 | $654,163 | *$654,163* |
| **Cumulative Losses** | $549,456 | $1,061,396 | $1,692,820 | $2,525,021 | $3,179,184 | *$3,833,346* |
| Compounding Percentage (VIIIX) | | 11.26% | -17.14% | 16.07% | 11.40% | 11.10% |
| **Potential Cumulative Compounded Losses** | **$549,456** | **$1,123,259** | **$1,562,183** | **$2,645,489** | **$3,601,166** | **$4,654,962** |

## B. Defendants' Forfeiture Practice Allocated De Minimis Amounts to Expenses

58.    As illustrated above, Defendants maintained a practice of using Plan forfeitures primarily to reduce employer contributions.

59.    Plaintiffs challenged Defendants' forfeiture practice through the Plan's claims and appeal procedures and documented the historical percentage of forfeitures used for Plan expenses.

60.    For plan years 2019 through 2023, the allocation of forfeitures to Plan expenses was extremely small, including approximately 0.004% in 2019 and approximately 6.892% in 2023.

61.    Plaintiffs alleged that Defendants' use of forfeitures to pay Plan expenses was "nearly zero."

62.    Plaintiffs alleged that Defendants' forfeiture allocation practice therefore used forfeitures "almost exclusively" to reduce employer contributions, benefiting the employer at the expense of Plan participants and beneficiaries.

63.    Plaintiffs requested that Defendants provide a documented explanation of the fiduciary process used to determine how forfeitures would be allocated between Plan expenses and reduction of employer contributions.

64.    Defendants did not provide a participant-centered fiduciary explanation demonstrating that their forfeiture allocation practice was the product of a prudent and loyal fiduciary process.

65.    The deduction of the Plan's administrative expenses from the participants' accounts reduced the funds available to participants for distribution and/or investing, and deprived the Plan of funds that otherwise would have been earned on the amounts deducted.

66.    Using the forfeitures to reduce future employer contributions is usually, but not always, in the best interest of the Company because that option decreases Acosta's own contribution costs and means that Acosta does not need to take money out of its own general revenues to pay for its Company contributions.

17

67. The option to reduce future employer contributions is not always in Acosta's best interest and may be in the best interests of Plan participants where there is a risk that Acosta may be financially unable to satisfy its Plan contribution obligations.

68. Absent a risk that Acosta would be unable to satisfy its contribution obligations under the Acosta Plan, using forfeitures to pay Plan expenses for Plan participants would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such administrative expenses.

69. Here, based on the amount of revenue Acosta generated in the billions of dollars per year from 2020-2025, there existed no reason why Acosta could not satisfy its contribution obligations in the millions of dollars without Plan forfeitures.

70. In deciding between using the forfeiture to benefit Acosta or using the forfeitures to benefit the participants, Defendants are presented with a conflict of interest in administering the Plan and managing and disposing of their assets.

71. In using Plan forfeitures primarily to reduce its own employer contributions from 2020-2025, even though it was permitted to use those Plan forfeitures to pay Plan expenses for participants, Acosta was motivated by self-interest.

18

### C.    ERISA's Duty Of Prudence And Forfeited Plan Assets

72.    Prior to the Class Period, like all prudent defined contribution plan fiduciaries and plan sponsor/employers/settlors, the Plan Committee knew that a defined contribution "plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula in the plan." See IRS "Retirement News for Employers," Vol. 7, at 4, Spring 2010 (citing to IRS Revenue Ruling 80-155).

73.    Similarly, all prudent defined contribution plan fiduciaries and employers knew that to ensure their plans remained qualified under the IRC, there were only a few allowable uses of forfeited plan assets, primarily among them being to defray plan expenses or reduce employer contributions.

74.    When designing their plan, employers had a few limited options to choose from with respect to the treatment of forfeited plan assets. Employers that wanted all forfeited plan assets to be used first to reduce employer contributions before defraying plan expenses could have drafted the terms of the plan to explicitly require that or write out plan expenses completely.

75.    Several other large plan sponsors drafted their plans to specifically require forfeited plan assets to be used to offset the employer's matching and discretionary contributions before being used to defray plan expenses, while others even prohibited using forfeited plan assets to defray plan expenses at all.

76.   On the opposite end of the spectrum, some plans preclude or limit forfeited plan assets from being used to reduce employer contributions.

77.   In between these two poles are plans—like the Acosta Plan—that accord discretion to their fiduciaries to use forfeited plan assets either to defray plan expenses or to offset employer contributions. In those instances, plan fiduciaries, as with any exercise of discretion over the use of plan assets, must use a prudent process to determine which of the allowable uses of forfeited plan assets would be consistent with their fiduciary duties.

78.   A plan fiduciary that exercises discretion to use forfeited plan assets to defray plan expenses is not providing a benefit greater than what was required or intended by the plan sponsor/employer (settlor).

79.   Rather, plans that grant discretion to plan fiduciaries to choose among multiple different options for allocating forfeited plan assets, including to defray plan expenses, necessarily contemplate that plan expenses will be defrayed if doing so accords with ERISA's fiduciary standards.

80.   When a plan sponsor/employer makes a decision to make a discretionary employer contribution, it is acting as a settlor and not in a fiduciary capacity with respect to the plan, and is therefore free to prioritize its own interests over those of the plan and its participants.

81.    In contrast, a plan fiduciary making fiduciary decisions based on the discretion granted by the plan sponsor/employer is explicitly prohibited by ERISA from considering the interest of the employer.

82.    There is no dispute that under the terms of the Plan, defraying Plan expenses was an allowable use of Plan forfeitures.

83.    The terms of the Plan require the Plan Committee to exercise its discretion related to the use of Plan forfeitures, and determine whether defraying Plan expenses was more consistent with its duties under the Plan and ERISA than using Plan forfeitures to offset employer contributions.

84.    Accordingly, from the beginning of the Class Period through the present, a prudent fiduciary as part of a prudent fiduciary process would have always considered whether using Plan forfeitures to defray Plan expenses was more consistent with their duties under the plan and ERISA than using Plan forfeitures to offset Company contributions.

85.    The facts and circumstances here support a finding that, from the beginning of the Class Period through the present, a prudent fiduciary of the Acosta Plan employing a prudent process would have chosen to use Plan forfeitures to defray more Plan expenses during the Class Period.

86.    ERISA's fiduciary duty of prudence is violated where, as here, the Plan Committee faced with a decision, from the beginning of the Class Period through the present, in choosing between allocating Plan forfeitures toward

21

offsetting employer contributions or defraying Plan expenses that would otherwise be borne by Plan participants, failed to conduct any investigation as to which choice would be in the best interest of the participants.

87.    If the Plan Committee had employed a prudent process from the beginning of the Class Period through the present, the Committee would have used more of the Plan forfeitures to defray some or all Plan expenses.

88.    In fact, however, the Plan Committee allocated a very small fraction of the Plan forfeitures to defray Plan expenses from the beginning of the Class Period through the present.

89.    The Plan Committee imprudently coordinated with Acosta and the Plan's recordkeeper, Fidelity, to calculate how much of the Plan forfeitures would be used to offset Acosta's employer contributions, while allowing Plan expenses to be deducted from the accounts of Plan participants, like Plaintiffs.

90.    Because the Plan Committee always had the ability to defray Plan expenses with Plan forfeitures, but did so sparingly, it is reasonable to infer that the Plan Committee employed a flawed decision-making process or did not employ any process at all to determine how to allocate Plan forfeitures during this time period.

91.    Although Plaintiffs asked Defendants to document their fiduciary process involving the use of Plan forfeitures, Defendants refuse to respond to that reasonable request during the administrative process.

92.    This is probably because the Plan Committee did not, in fact, investigate whether there was any set of circumstances that would support a decision to reduce Acosta's Plan contributions prior to defraying Plan expenses, and there are no facts or circumstances that could possibly make the Plan Committee's failure to use Plan forfeitures to defray Plan expenses prudent.

93.    First, there is no indication that using Plan forfeitures to offset employer contributions was necessary to maintaining those contribution levels, as there are no facts or circumstances to suggest that Acosta's process in determining the amount of its Plan contributions is based on any consideration of the amount of Plan forfeitures.

94.    In fact, just like all other companies that have discretionary contribution provisions, from the beginning of the Class Period through the present, Acosta's decisions related to employer contributions were made without reference to the amount of Plan forfeitures and were instead driven by the need to attract and retain talented employees.

95.    Companies like Acosta actually use their past benefit history to both attract new employees and promote to their existing employees the benefits provided by the plan design even if those benefits are discretionary.

96.    On the other hand, Plan expenses are immaterial to both Acosta's decision to provide a discretionary employer contribution, as well as to Acosta's financial results.

97.    While Acosta's Plan contributions are initially discretionary and are made annually, typically around six months after the end of the prior plan year (but in all cases on or before December 31st of the Plan Year following the Plan Year to which the contributions relate), Acosta typically makes the settlor decision about the amount of the its employer contributions sometime in the fourth quarter of the Plan year.

98.    At this point, the Plan Committee knows the exact amount of declared employer contributions and only makes fiduciary decisions with respect to Plan assets based on the actual employer contributions declared by Acosta, i.e., the circumstances then prevailing. Therefore, it is irrelevant for the Plan Committee's decision-making process with respect to the allocation of Plan forfeitures that the employer contributions were ever once discretionary.

99.    Second, there are no facts to suggest that Acosta would be unable to meet its future Plan contribution obligations, such that using Plan forfeitures to offset employer contributions was necessary.

100.    Acosta was able to meet its future contributions from the beginning of the Class Period through the present, and would have been able to

meet its declared employer contributions each year, even if no Plan forfeitures were applied to offset its contributions.

101.   In fact, from 2020 to 2025, Acosta's annual revenue ranged from approximately $1.6 billion to $1.9 billion.

102.   Yet even if there was some indication that Acosta would be unable to meet future employer contribution obligations, a prudent fiduciary would only offset the amount necessary to prevent Acosta from being unable to meet its future contributions, and then allocate the remaining funds to other more beneficial options, like reducing Plan expenses shouldered by the Plan participants.

103.   Consequently, an objective analysis of the available options during the Class Period, guided by ERISA's fiduciary duty of prudence, would indisputably not result in Plan fiduciaries choosing to use nearly all Plan forfeitures available to offset future employer contributions during that period instead of using Plan forfeitures to defray some or all Plan expenses borne by Plaintiffs and other Plan participants.

104.   Instead of acting prudently by using Plan forfeitures to defray Plan expenses charged to the individual accounts of Plan participants on an ongoing basis, the Plan Committee chose to use almost all of the Plan forfeitures for the exclusive purpose of offsetting Acosta's employer  contributions

to the Plan, thereby saving Acosta millions of dollars from its general revenues at the expense of the Plan.

105.    Defendants should have used the fiduciary discretion granted to it in the Plan to pay some or all of the Plan expenses for Plan participants.

106.    Defendants' contrary fiduciary decision with regard to the Acosta Plan forfeitures cost the Plan's participants close to $5 million dollars from 2020 through 2025.

107.    The Plan Committee's conduct during the Class Period, at the very least, necessitates the inference that either it did not have processes in place to weigh the benefits to participants of allocating Plan forfeitures or, alternatively, the process employed was fatally flawed.

**D**.    **Administrative Exhaustion and Final Denial**

108.    Plaintiffs pursued the Plan's internal claims and appeal process challenging Defendants' forfeiture practices.

109.    Plaintiffs filed initial claims on August 11, 2025, and once those claims were denied, filed an internal appeal dated November 14, 2025.

110.    On January 13, 2026, Defendants issued a final written denial of Plaintiffs' appeals.

111.    In the final denial, Defendants denied the appeal and rejected Plaintiffs' challenge to the forfeiture allocation practices.

112.    Defendants' denial acknowledged that Plaintiffs "ha[ve] the right to bring a civil action under Section 502(a) of ERISA."

113.    Plaintiff has exhausted administrative remedies and is entitled to seek relief in this Court.

### E.    Arbitration and Class Waiver Plan Provisions Do Not Bar This Action

114.    The Plan includes provisions purporting to require arbitration and to waive class or representative proceedings.

115.    Plaintiffs seek Plan-wide relief expressly authorized by ERISA, including relief under ERISA §§ 502(a)(2) and 409(a), and appropriate equitable relief under ERISA § 502(a)(3).

116.    In the Eleventh Circuit, ERISA arbitration provisions are unenforceable to the extent they operate as a prospective waiver of substantive statutory remedies and prevent effective vindication of ERISA rights, including by preventing the right to seek plan-wide relief. Williams v. Shapiro, 161 F. 3d 1313, 1323 (11th Cir. 2025).

117.    Accordingly, because the Plan's arbitration and class waiver provisions purport to eliminate or prohibit Plaintiffs' pursuit of Plan-wide relief and other statutorily authorized remedies, those provisions are unenforceable and cannot bar this action.

## CLASS ALLEGATIONS

118.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following proposed class:

> All participants and beneficiaries of the Acosta, Inc. 401(k) Plan, during the applicable limitations period, whose Plan accounts were affected by Defendants' misallocation of Plan forfeitures.

119.   Excluded from the Class are Defendants, any fiduciaries to the Plan during the Class Period (to the extent required by law), and the immediate family members of any such persons, and any entity in which Defendants have a controlling interest.

### A.      Rule 23(a) Prerequisites

120.   The proposed Class is so numerous that joinder of all members is impracticable, as the most recent Plan 5500 Forms indicate that there are over 13,500 Plan participants impacted by Defendants' forfeiture allocations practices.

121.   Common questions of law and fact exist as to all Class members, including:

a.  Whether Defendants are fiduciaries with respect to the challenged conduct;

b.  Whether Defendants breached ERISA fiduciary duties by allocating forfeitures overwhelmingly to reduce employer contributions rather than to pay Plan expenses;

c.  Whether Defendants acted loyally and prudently with respect to forfeiture allocation decisions;

d.  Whether Defendants failed to engage in a prudent fiduciary process;

e.  Whether the Plan suffered losses as a result of Defendants' conduct; and

f.  The appropriate equitable and monetary relief to restore losses to the Plan and to remedy Defendants' breaches.

122.  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and Class members were subject to the same forfeiture allocation practices and suffered the same type of injury.

123.  Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in complex ERISA litigation and fiduciary-breach class actions.

**B.    Rule 23(b) Requirements**

124.  Class certification is appropriate under Rule 23(b)(1) because adjudications with respect to individual class members would create a risk of inconsistent adjudications and would impair the ability of absent class members to protect their interests.

125.  Class certification is also appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the

Class, making injunctive and declaratory relief appropriate with respect to the Class as a whole.

126.   Class certification is appropriate under Rule 23(b)(3) because common questions predominate and a class action is superior to other methods for fair and efficient adjudication.

## CAUSES OF ACTION

COUNT I
Breach of Fiduciary Duties
ERISA §§ 404(a)(1)(A), 404(a)(1)(B), 404(a)(1)(D)
Under ERISA §§ 502(a)(2) & 409(a), on behalf of Plan Against Plan Committee

127.   Plaintiffs incorporate by reference the preceding paragraphs 1-9, 13-107, as though fully set forth herein.

128.   ERISA requires Plan fiduciaries to discharge their duties solely in the interest of Plan participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable administrative expenses.

129.   ERISA requires fiduciaries to act prudently and to administer the Plan in accordance with Plan documents insofar as such documents are consistent with ERISA.

130.   Defendants were fiduciaries of the Plan under ERISA to the extent they exercised discretionary authority or control over Plan administration, Plan expenses, and forfeiture allocation and use.

131.   Defendants breached their duties of loyalty and prudence by allocating forfeitures overwhelmingly to reduce employer contributions while allocating only de minimis amounts of forfeitures to pay Plan expenses, without a documented prudent process and without a participant-centered fiduciary justification.

132.   Defendants breached their fiduciary duties by failing to administer forfeitures consistent with ERISA's exclusive purpose rule and the Plan's forfeiture provisions, including the Plan's text recognizing that employer contributions are reduced by forfeitures "that are not used to pay Plan expenses."

133.   Defendants' breaches caused losses to the Plan, and Defendants are liable to restore such losses pursuant to ERISA § 409(a).

134.   Plaintiffs seek relief under ERISA § 502(a)(2) and § 409(a) to restore losses to the Plan, together with other appropriate plan-wide relief.

COUNT II
Equitable Relief — ERISA § 502(a)(3)
Surcharge, Accounting, Injunctive Relief, and
Other Appropriate Equitable Relief Against Plan Committee

135.   Plaintiffs incorporate by reference paragraphs 1-9, 13-35, 49-107, as though fully set forth herein.

136.   Plaintiffs seek appropriate equitable relief under ERISA § 502(a)(3) to redress Defendants' violations and enforce ERISA and the Plan.

137.    Defendants' forfeiture allocation and use practice resulted in participants and the Plan bearing administrative expenses while the employer received the benefit of reduced contribution obligations.

138.    Plaintiffs seek, among other equitable relief:

      a.    Surcharge against Defendants for amounts improperly retained and/or resulting from disloyal and imprudent forfeiture administration;

      b.    An accounting of forfeitures and the allocation and use of forfeitures;

      c.    Injunctive relief requiring Defendants to administer forfeitures consistent with ERISA and the Plan;

      d.    Such other equitable relief as the Court deems appropriate to prevent ongoing harm.

COUNT III
Breach of Fiduciary Duties —
ERISA §§ 404(a)(1)(A), 404(a)(1)(B), 404(a)(1)(D) Against
Acosta and Board Failure to Adequately Monitor Other Fiduciaries

139.    Plaintiffs incorporate by reference paragraphs 23, 47, and 49-107, as though fully set forth herein.

140.    Under the Acosta Plan, Defendants Acosta and Board had the authority to appoint and remove members or individuals on the Plan Committee responsible for Plan's forfeitures and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

32

141.   In light of this authority, Defendants Acosta and Board had a duty to monitor those individuals responsible for Plan's forfeitures on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Acosta Plan in the event that these individuals were not fulfilling those duties.

142.   Defendants Acosta and Board had a duty to ensure that the individuals responsible for Plan's forfeitures on the Plan Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Acosta Plan's forfeitures; and reported regularly to Defendants Acosta and Board.

143.   The objectively disloyal, imprudent, and conflicted manner in which Defendant Plan Committee handled the Plan's forfeitures inferentially establish that Defendants Acosta and Board breached their duty to monitor by, among other things:

   a.   Failing to monitor and evaluate the performance of individuals responsible for the Plan's forfeitures on the Plan Committee or have a system in place for doing so, standing idly by as the Acosta Plan misallocated the Plan's forfeiture for Acosta's benefit;

   b.   Failing to monitor the process by which individuals responsible for the Plan's forfeitures were evaluated and

33

failing to investigate the proper use of the Plan's for-
feitures; and

c.    Failing to remove individuals responsible for Plan for-
feitures on the Plan Committee whose performance
was inadequate in that these individuals continued to
misallocate Plan forfeitures for the benefit of ACOSTA.

144.   As a consequence of the breaches of the duty to monitor the alloca-
tion of the Plan's forfeitures, the Plaintiffs and the Plan's participants suffered
millions of dollars of objectively unreasonable and unnecessary monetary
losses.

145.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants
Acosta and Board are liable to restore to the Acosta Plan all losses caused by
their failure to adequately monitor individuals responsible for Plan's forfei-
tures on the Plan Committee. In addition, Plaintiffs are entitled to equitable
relief and other appropriate relief as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter
judgment in Plaintiffs' favor and against Defendants and award the following
relief:

A.    Certification of this action as a class action under Rule 23 and ap-
pointment of Plaintiffs as Class representatives and Plaintiffs'
counsel as Class counsel;

B.    A declaration that Defendants violated ERISA by breaching fidu-
ciary duties in the administration of forfeitures;

C.     An order requiring Defendants to restore to the Plan all losses resulting from Defendants' breaches pursuant to ERISA § 409(a);

D.     An accounting and equitable relief under ERISA § 502(a)(3), including surcharge and injunctive relief;

E.     An order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

F.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary to administer the Acosta Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

G.     Pre-judgment and post-judgment interest as permitted by law;

H.     Reasonable attorneys' fees and costs under ERISA § 502(g)(1); and

I.     Such other and further relief as the Court deems just and proper.

Date: January 21, 2026                    Respectfully submitted,

                                          CHIRINOS LAW FIRM, PLLC

                                          */s/ Tulio D. Chirinos*
                                          Tulio D. Chirinos
                                          Florida Bar No. 1022468
                                          20283 State Road 7, Suite 592
                                          Boca Raton, FL 33498
                                          Telephone: 561-299-6334
                                          Email: tchirinos@chirinoslawfirm.com

WALCHESKE & LUZI, LLC

Paul M. Secunda (*pro hac vice* motion
forthcoming)
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

*Attorneys for Plaintiffs and Proposed
Class*